IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT
OF TEXAS AUSTIN DIVISION

| | |
|---|---|
| ATHIGE DENZIL DESILVA, individually, as heir at law to the ESTATE OF DR. MAURIS DESILVA, and on behalf of all wrongful death beneficiaries, Plaintiff,<br><br>V<br><br>CHRISTOPHER TAYLOR, KARL KRYCIA, & THE CITY OF AUSTIN, Defendants. | § § § § § § § § § § § § § § §    Civil Action No. 1:21-CV-00129 |

## PLAINTIFF'S COMPLAINT

Plaintiff ATHIGE DENZIL DESILVA files this lawsuit against CHRISTOPHER TAYLOR, KARL KRYCIA, and THE CITY OF AUSTIN and would show the Court and Jury the following in support thereof:

1. On July 31, 2019, Dr. Mauris DeSilva had a mental breakdown. A neighbor called 911, hoping that the Austin Police Department could help him. Instead, Austin PD Officers Christopher Taylor and Karl Krycia came to the condominium where Dr. DeSilva lived and shot and killed him in the hallway.

2. Mr. Denzil DeSilva brings this lawsuit to seek justice for the violation of his son's civil rights due to the inadequate polices of and training by the Austin Police Department regarding responding to mental health crises and the extremely reckless, if not deliberate, indifference to the life and safety of Dr. Mauris DeSilva by Officers Taylor and Krycia.

## I. PARTIES

3. Plaintiff, ATHIGE DENZIL DESILVA, is a citizen of Minnesota. He was Dr.

MAURIS DESILVA's father, is an heir at law to his Estate, and is a wrongful death beneficiary under Texas Law.

4.  Defendant, CHRISTOPHER TAYLOR, is an officer with the Austin Police Department. He is sued in his individual capacity and was acting under color of law at all relevant times. He may be served at the Austin Police Department, 715 E. 8th St. Austin, Texas.

5.  Defendant, KARL KRYCIA, is an officer with the Austin Police Department. He is sued in his individual capacity and was acting under color of law at all relevant times. He may be served at the Austin Police Department, 715 E. 8th St. Austin, Texas.



*Figure 1 Dr. Mauris DeSilva with his parents on his graduation day.*

6.  Defendant, CITY OF AUSTIN, is a municipality that operates the Austin Police Department and may be served through its City Clerk at 301 W. 2nd St., Austin, TX 78701. Brian Manley is Austin's policymaker when it comes to policing. *Service is hereby requested at this time.*

## II. JURISDICTION AND VENUE

7. This case is brought pursuant to 42 U.S.C. § 1983. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

8. This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct that caused the death of Dr. Mauris DeSilva, which occurred in Austin, Travis County, Texas, within the Western District of Texas.

9. Venue of this cause is proper in the Western District pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Austin, Texas, which is within the Western District of Texas.

## III. FACTS

*A History of Mental Health Police Contacts*

10. Mauris DeSilva grew up in Sri Lanka with his parents. He held a doctorate in biomedical engineering. In July 2019, he lived in the Spring Condominiums at 300 Bowie St., Austin, Texas, 78703.

11. During the last years and months of his life, Dr. DeSilva struggled with increasingly severe mental illness. Austin PD was well aware of this fact.

12. In February 2015, Dr. DeSilva grabbed a knife and threatened to hurt himself. Austin PD responded to the scene and took Dr. DeSilva to the hospital without incident.

13. According to Austin PD's own records, on May 22, 2019, Dr. DeSilva required an "Emotionally Disturbed Person" Intervention by Austin PD and on July 7, 2019, Dr. DeSilva was committed on an Emergency Detention. This was mere weeks before Dr. DeSilva's tragic death.

*An Ongoing Mental Health Crisis*

14. Shortly before 5:00 o'clock p.m. on July 31, 2019, a resident of Spring Condominiums, Grayson Ramage, called 911 to report that he was worried that his neighbor, Dr. Maruis DeSilva, was having "another mental episode."

15. Mr. Ramage requested a mental health officer be sent to the location and asked the call operator if a mental health officer would be dispatched. The operator responded, "Yes, yes, I requested a mental health officer on the call, yes."

16. Dr. DeSilva went downstairs and was seen by Todd Cobb, an employee of Spring Condominiums. Mr. Cobb saw that Dr. DeSilva was holding a knife to his neck and called 911.

17. At around the same time, Oliver Karen and Reena Kaven both saw Dr. DeSilva outside the Spring Condominium holding a knife up to his neck then enter the building using a key card. They each called 911 to report this information.

18. Austin PD Officer Benjamin Lynch was the only mental health officer on duty at this time. Officer Lynch had just finished another call and was immediately available to respond to this call. Officer Lynch did not respond to this call.

19. Instead, Austin Police Officers Christopher Taylor and Karl Krycia responded to the scene. Officers Joseph Cast and Phillip Zuniga responded as backup. None of these officers were mental health officers.

20. Upon arrival, the officers entered the building, spoke to lobby staff, and reviewed security footage. They learned that Dr. DeSilva was on the fifth floor.

21. At this point, the officers on scene knew that Dr. DeSilva had a history of mental health contacts, was currently experiencing a mental health crisis, and had not threatened or

harmed anyone other than himself.

### *The Murder of Dr. DeSilva*

22. From their review of the surveillance footage, the officers knew that Dr. DeSilva was standing on the fifth floor a few feet from the freight elevator holding a knife. They also knew that there was a stairwell entrance down the hall from Dr. DeSilva.

23. Rather than take the stairs, Officers Taylor, Krycia, Cast, and Zuniga entered the freight elevator accompanied by Martin Guardado, an employee of Spring Condominiums.

24. On the ride up to the fifth floor, Officers Taylor and Krycia agreed they should have "lethal" coverage and drew their firearms and pointed them at the elevator door. Officer Cast drew his taser. Officer Zuniga remained hands free.

25. When the elevator door opened, Dr. DeSilva was standing in the hallway across from the elevator with his back facing the officers. He was looking in a mirror and holding a knife to his neck.

26. Officers Taylor and Krycia shouted at Dr. DeSilva and instructed him to drop the knife. Dr. DeSilva complied with this request and lowered his knife.

27. Officers shouted, "hey man," at Dr. DeSilva. In response, Dr. DeSilva turned and took one step in the direction of the officers.

28. Officer Cast immediately fired one round of his taser for a cycle of five seconds. Rather than wait and see if the less lethal taser shot would be effective, Officers Taylor and Krycia simultaneously fired multiple shots at Dr. DeSilva.

29. The bullets struck Dr. DeSilva's chest, but they were not instantly fatal. He was transported to Dell Seton Medical Center at UT, where he was pronounced dead due to multiple gunshots wounds.

30. Despite having knowledge of Dr. DeSilva's prior mental health contacts and of his ongoing mental health crisis, officers responded as if this were the scene of a violent crime.

31. Officers Taylor and Krycia had no basis to reasonably believe to fear that either their lives or the lives anyone else present were in danger when they shot and killed Dr. DeSilva.

*A Pattern of Police Brutality*

32. Chief of Police Brian Manley is the policymaker for the City of Austin concerning police policies, training, and staffing.

33. Austin PD has a history of using deadly force against unarmed non-white males. The following disturbing pattern of incidents have taken place over the course of more than a decade and include the following victims:

   a. In 2003, Austin PD Officer Scott Glasgow shot and killed twenty-year-old Jesse Lee Owens, an African American, during a traffic stop. A Travis County grand jury indicted Glasgow for negligent homicide, though the charges were later dropped. Owens was unarmed. Following this event, the City of Austin failed to re-train officers or alter its training.

   b. In 2005, Austin PD Officer Julie Schroeder shot and killed unarmed Daniel Rocha, who was Hispanic. Although the City publicly denied that its officers used excessive force or violated policy, it entered into a $1,000,000.00 settlement with Mr. Rocha's estate. Once again, the City failed to re-train officers or alter its training after this incident.

   c. In 2008, Austin PD Officer Michael Olsen shot and killed unarmed Kevin Brown, who was African American. Again, the City denied in publicly filed court documents that Olsen used excessive force. However, behind the scenes, Chief

      Acevedo fired Officer Olsen and the City settled claims related to Mr. Brown's death for $1,000,000.00. Following this event, the City of Austin failed to re-train officers or alter its training in any meaningful way.

d.    In 2009, Austin PD officer Leonardo Quintana gunned down eighteen-year-old Nathaniel Sanders, another African American, who was alleged to be unarmed. Sanders died with a bullet wound to the back of his head. In the same incident, another young African-American man, Sir Lawrence Smith, was shot while simply fleeing the incoming gunfire. After waking to gunshots and glass breaking, Smith tried to escape the danger by fleeing by car—as he had every right to do. Though Mr. Smith was unarmed, Officer Quintana shot him in the chest. No remedial action was taken by Austin PD as a result of these shootings. Instead, the City settled the cases for $925,000.00.

e.    In 2012, Austin PD officer Eric Copeland shot and killed Ahmede Bradley, an African American, after a traffic stop. During the interaction, Mr. Bradley allegedly fled on foot from the scene. Officer Copeland recklessly chased down Mr. Bradley and used deadly force in the ensuing struggle. Again, no remedial action was taken by Austin PD.

f.    In 2013, Austin PD officer Charles Kleinert shot and killed Larry Jackson, Jr. after chasing him from the scene of a bank robbery that took place hours earlier. Mr. Jackson, an African American, was unarmed and shot in the back of the head. Instead of taking remedial action, the City paid a $1,700,000.00 settlement.

g.    In 2014, the City refused to discipline Officer Greg White for shooting Jawhari Smith, an African-American, who had his hands up and had just dropped an

       empty BB gun. Instead of providing new training, the City settled the case.

h.    In 2016, Officer Gregory Freeman shot and killed David Joseph, an African-American. Mr. Joseph was naked, unarmed, and standing in an empty street when Officer Freeman approached him and drew his weapon. Although Officer Freeman was ultimately terminated for the shooting and Chief Art Acevedo condemned his conduct, the County failed to bring criminal charges against him and the City denied in public court filings that Officer Freeman had used excessive force. Despite the egregiousness of the shooting and paying a $3,250,000.00 settlement, the City did not initiate new or different training for its officers.

34.    In prior litigation, an Austin PD sergeant in charge of training police officers testified that Austin PD trains officers to always treat a knife as a deadly weapon even though a knife does not pose the same danger as a gun.

***An Inadequate Policy for Mental Health-Related Incidents***

35.    At the time of Dr. DeSilva's homicide, the Ex-Assistant Chief Justin Newsom recognized that the Austin Police Department had so far failed to provide mental health training to Austin PD officers. He stated, "We just haven't had time to get around to writing this plan to try and train everybody as a mental health officer."

36.    According to a recent article in the *Texas Observer*, "[o]f the 15 most populous U.S. cities, Austin has the highest per capita rate of fatal mental-health related police shootings: According to a 2018 city audit, a third of the 24 people killed in police shootings from 2010 through 2016 had confirmed mental health conditions, compared to a national average of 22

percent."[1]

37. It is obvious that mental health training of additional officers is required to prevent unjust outcomes — including death at the hands of police officers — for people going through a mental breakdown. Yet, even as City policymakers recognized this deadly problem, Officers Christopher Taylor and Karl Krycia received no training regarding mental health crisis response before they shot and killed Dr. DeSilva.

***An Ongoing Danger to the Public***

38. Even as it claimed to continue to investigate Dr. DeSilva's shooting, Austin PD continued to dispatch Defendants Taylor and Krycia, where they would be called upon to make life and death decisions, despite their erratic and violent history. As a consequence, Austin citizens, especially vulnerable minorities, remained in potential danger from Officers Taylor and Krycia.

39. Less than a year after Dr. DeSilva's homicide, Officer Taylor shot and killed Michael Ramos, firing without hesitation even though his victim was unarmed and defenseless.

## IV. CLAIMS

### A. § 1983 claims against Defendants Taylor and Krycia

40. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

41. Defendants Taylor and Krycia, who were acting under color of law, shot Dr. DeSilva when he posed no threat of serious bodily injury or death to anyone other than himself. In fact, Dr. Mauris DeSilva had been holding a knife to his own neck and had put it down when asked to by Defendants Taylor and Krycia. Dr. DeSilva had done nothing threatening.

---

[1] Michelle Raji, *Why is APD Responding to Mental Health Crises Like Violent Crimes?*, TEXAS OBSERVER, June 4, 2020, https://www.texasobserver.org/mauris-desilva-austin-protests-police/.

42.     As a consequence, Defendants Taylor and Krycia's use of force against Dr. Mauris DeSilva was clearly excessive to the need, objectively unreasonable in light of established law, and directly caused his death. Therefore, Defendants Taylor and Krycia's actions violated Dr. Mauris DeSilva's Fourth and Fourteenth Amendment rights to be free from excessive force/unreasonable seizure. *See* Hafer v Melo, 502 US 21, 25; *see also* Mann v Taser Int'l, Inc. 588 F. 3d 1291 (11th Cir. 2009).

43.     As a direct and proximate result of Defendants Taylor and Krycia's actions, Dr. Mauris DeSilva suffered greatly before dying. Plaintiff lost his brilliant son, and the anguish he feels and will feel for the rest of his life is truly horrific. Plaintiff Denzil Desilva is devastated beyond words.

### B. § *1983* Monell *claim against the City of Austin*

44.     Plaintiff incorporates by reference all of the foregoing and further allege as follows:

- The City of Austin had the following policies and/or practices in place when Defendants Taylor and Krycia ruthlessly shot Mauris DeSilva:

- Dispatching inadequately trained or screened officers to life and death crisis situations;

- Dispatching inadequately trained or screened officers to mental health crisis calls;

- Failing to adequately supervise officers during encounters where long-range weapons are deployed;

- Failing to train officers concerning alternatives to the use of deadly force.

- Failing to train officers to de-escalate encounters involving a mental health crisis

rather than resort to deadly force.

- Using excessive deadly force.

- Discriminating against minority suspects by using unwarranted deadly force at disproportionally higher rates;

- Failing to change practices following wrongful shootings or train officers about known wrongful shootings;

- Distinguish the different range of damage can cause a knife against a gun;

- Failing to train on the dangers of institutional mental health; and

- Adopting and promulgating a policy of underfunding Mental Health officers within the APD such that there were not enough Mental Health officers to address the needs of a city of Austin's size, which directly led to injuries and deaths such as Dr. DeSilva's.

45. To be clear each of the policies delineated above which lead directly to the unconstitutional act complained of were either (1) official policies adopted and promulgated by officers of the City of Austin; or (2) government practices and customs that, although not officially authorized, were widespread and well settled; or (3) were caused by an official with final policy making authority. *See* Thomas v. Cook Cnty. Sheriff's Dep't, 604 F.3d 293, 303 (7th Cir. 2010) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). These policies were promulgated with deliberate indifference to Dr. Mauris DeSilva's Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that the City of Austin police officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations

alleged here, all of which were under the color of law, would result.

46. Consequently, the policies delineated above were a moving force of the Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

## V. DAMAGES

47. Defendants deprived Dr. Mauris DeSilva of his civil rights under the United States Constitution and federal law. Moreover, these acts and omissions by Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and proximately caused and/or were the moving force of the wrongful death of Dr. Mauris DeSilva.

48. Accordingly, Plaintiff in his individual capacities, in his capacities as heir at law on behalf of the Estate of Dr. Mauris DeSilva, and as representatives of all wrongful death beneficiaries of Dr. Mauris DeSilva, assert claims under 42 U.S.C. §1983 and the Texas wrongful death and survivorship statutes.

49. Plaintiff Denzil DeSilva, in his capacities as heirs at law on behalf of the Estate of Dr. Mauris DeSilva, have incurred damages including, but not limited to, the following:

- Physical pain and mental anguish suffered by Mauris DeSilva before he died; and,

- Funeral and burial expenses.

50. Plaintiff, Denzil DeSilva, in his individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- Past and future mental anguish; and

- Past and future loss of companionship, society, services, and affection with their

son.

## VI. PUNITIVE/EXEMPLARY DAMAGES

51.     As Defendant's employees' conduct was deliberately reckless, excessive, and reprehensible, Plaintiff asserts a claim for or exemplary damages against the City of Austin.

## VII. DEMAND FOR JURY

52.     Pursuant to Federal Rule of Civil Procedure 48, Plaintiff requests a jury trial.

## VIII. PRAYER FOR RELIEF

53.     Accordingly, Plaintiff ask that judgment be awarded against Defendants for:

(a)     Compensatory damages against all Defendants, jointly and severally,

(b)     Punitive damages as to Defendant City of Austin only,

(c)     Attorneys' fees, including reasonable and necessary expenses such as expert fees, pursuant to 42 U.S.C. § 1988,

(d)     Costs of court;

(e)     Judgment at the highest rate allowable under the law; and

(f)     All other relief to which Plaintiffs are justly entitled.

Respectfully submitted,

DUNAWAY LAW FIRM, P.C.
1411 West Avenue, Suite 100
Austin, Texas 78701
PHONE (512) 469-7941
FAX (512) 479-9510
atty@austinfairlaw.com

_____
Aspen J. Dunaway
State Bar No. 24034425
Rosa Alonso
State Bar No. 24121310
Board Certified, Personal Injury Trial Law Texas
Board of Legal Specialization
ATTORNEYS FOR PLAINTIFF


_____
J. Bradley Vinson
Smith & Vinson Law Firm, Partner
SBN: 24100021
Attorney for Plaintiff
1411 West Ave. #124
Austin, Texas 78701
Tel: 512.368.9044
Fax: 512.368.8265


_____
Jarrod L. Smith
Smith & Vinson Law Firm, Partner
SBN: 24094095
Attorney for Plaintiff
1411 West Ave. #124
Austin, Texas 78701
Tel: 512.368.9044
Fax: 512.368.8265